# EXHIBIT C

Case 3:07-cv-05739-SC   Document 61-4   Filed 08/22/2008   Page 1 of 15

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                        ---oOo---

 4

 5   JOEL RUIZ, on behalf of himself )
     and all others similarly        )
 6   situated,                       )
                                     )
 7              Plaintiff(s),        )
                                     )
 8        v.                         ) No. CV07-05739-SC
                                     )
 9   GAP, INC., and DOES 1-9,        )
     inclusive,                      )
10                                   )
                Defendant(s).        )
11                                   )
                                     )

12

13

14

15            WEDNESDAY, JUNE 18, 2008

16                   ---oOo---

17                 DEPOSITION OF

18                   JOEL RUIZ

19                   ---oOo---

20

21

22
```

Exhibit C
Page 1

```
 1  recollection of attempting to contact the Gap after
 2  getting Exhibit 2.
 3  A       Yes.  I was unsuccessful on that.
 4  Q       Okay.  And my question now is:  In what manner do
 5  you think you tried to contact the Gap after getting
 6  Exhibit 2?
 7  A       I tried contacting them about the 12 months to
 8  possibly get more.  I believe that was the reason.
 9  Q       And how do you think you tried to contact them?
10  A       I guess by calling the number on there.
11  Q       So you think you did call the toll-free number?
12  A       I can't tell if it was this number or a different
13  number.
14  Q       Okay.  And what was your purpose in contacting
15  the Gap?  Apart of which number you may have called, what
16  did you want to convey to them?
17  A       About the 12 months monitoring.  But as I said, I
18  was unsuccessful on contacting.
19  Q       And when you say you wanted to contact them about
20  the 12 months monitoring, was it that you wanted to sign
21  up or you wanted to register your view that 12 months
22  wasn't sufficient?
23  A       I wanted to dispute the 12 months.
24  Q       Okay.  And did you have a communication with the
25  Gap in October 2007 disputing the 12 months duration of
```

Exhibit C
Page 2

31

JOEL RUIZ

BARKLEY
Court Reporters

```
 1  the credit monitoring?
 2  A       I'm sorry, what date did you say?
 3  Q       In October 2007, did you have a communication
 4  with the Gap in which you disputed the 12 months credit
 5  monitoring?
 6  A       No.
 7  Q       And why?
 8  A       I was unable to reach an operator or a
 9  representative.
10  Q       Because you were put on hold or what's your
11  understanding?
12  A       I believe it took too long and I was using my
13  cell phone, so...
14  Q       So what you think happened, your best
15  recollection, if I understand you correctly, is that soon
16  after getting Exhibit 2, you were on your cell phone and
17  made an attempt to contact the Gap, but were put on hold
18  and never actually spoke to a customer representative?
19  A       Correct.
20  Q       How many efforts did you make?
21  A       Just one.
22  Q       And did you thereafter try to contact Gap through
23  the Web site that's -- the address shown on Exhibit 2?
24  A       No, I did not attempt any further -- further
25  contact with Gap.
```

Exhibit C
Page 3

32

JOEL RUIZ

BARKLEY
Court Reporters

1  A        Correct. But as research has shown, identity
2  theft does not happen immediately.
3  Q        So you thought the odds of an ID theft were
4  greater after 90 days than within 90 days; is that
5  correct?
6  A        Correct.
7  Q        And based on that, you were attempting to delay
8  the start date of the Triple Advantage Credit Monitoring
9  program by waiting toward the end of the expiration of the
10 90-day period; is that correct?
11 A        I did not wait until the end. I did it on -- in
12 December, but I was trying to choose a time frame best
13 suitable for the one year that I was offered.
14 Q        Okay. And later on in that same paragraph, there
15 is an activation code, do you see that, that you were
16 assigned?
17 A        Correct.
18 Q        Do you understand that you were assigned a unique
19 activation code for you that would enable you to sign onto
20 the Triple Advantage Credit Monitoring program?
21 A        I was under the impression, but now it's -- as
22 you say it's unique, now I'm certain.
23 Q        The -- strike that.
24          About a third of the way down on page two in all
25 bold, it says, "Additional precautions you can take."

1    Do you see that?
2  A    Correct.
3  Q    And there are four or five bulleted paragraphs
4  starting with, "Look out for any unusual activity."
5    Do you see that?
6  A    Yes.
7  Q    Did you have your Wells Fargo credit card account
8  as of October 2007?
9  A    Yes.
10 Q    And did you look on your monthly credit card
11 statements to see if there was any unusual activity?
12 A    Yes.
13 Q    Did you find any?
14 A    No.
15 Q    And by "unusual activity," what I mean is charges
16 that you thought you hadn't incurred, somebody else might
17 have incurred, on your account.
18    You didn't find anything like that?
19 A    Correct.
20 Q    The next bullet says, "Consider contacting your
21 credit card issuers and financial institutions to inform
22 them of what happened."
23    Did you do that?
24 A    No.
25 Q    Do you have a savings and checking account?

```
 1   A      Yes.
 2   Q      With Wells Fargo?
 3   A      Yes.
 4   Q      But you didn't contact them, either, I take it,
 5   after getting this letter?
 6   A      No.
 7   Q      Okay.  The fifth bullet down says, "You may
 8   periodically obtain credit records from each of the three
 9   nationwide credit bureaus listed below to have information
10   relating to fraudulent transactions removed."
11          Do you see that?
12   A      Yes.
13   Q      Did you do that?
14   A      I attempted to do that, correct, yes.
15   Q      When did you do that?
16   A      I'm not -- I'm not familiar with the date.
17   Q      And was that TransUnion you contacted?
18   A      No.  For -- TransUnion was for something else.
19   Q      Okay.  What did you attempt to do to obtain
20   credit reports from the three nationwide credit bureaus?
21   A      As I said, when I noticed -- I see it everywhere
22   on the Internet regarding one free copy per year, the
23   annual free credit report, and I did attempt to do that,
24   but I'm unsure if I was successful or not since I was also
25   unsuccessful on the Triple Advantage Program.
```

Exhibit C
Page 6

38

JOEL RUIZ

BARKLEY
Court Reporters

```
 1   Q        Do you remember which of the three credit bureaus
 2   you tried to get your credit report from?
 3   A        It was probably Experian.
 4   Q        And you think you did this at the time soon after
 5   getting Exhibit 2?
 6   A        No.
 7   Q        It was later?
 8   A        Correct.
 9   Q        Do you recall when?
10   A        No.
11   Q        When you get a credit report online from one of
12   the three credit bureaus, your credit report appears there
13   on the screen of your computer almost instantly once you
14   successfully log on.
15            Did that happen?  Do you recall that happening?
16   A        No.  As I said, I was unsuccessful, I believe.
17   Q        Did you try phoning any of the three toll-free
18   numbers listed in that -- underneath that bullet to obtain
19   a copy of your credit report?
20   A        No.  I did not want to -- want to call them, no.
21   Q        And your best recollection is that you attempted
22   to do this through the Internet, but not through the
23   toll-free number?
24   A        Correct.
25   Q        The next bullet says, "To further protect
```

Exhibit C
Page 7

39

JOEL RUIZ

BARKLEY
Court Reporters

```
 1   yourself, you may contact the fraud departments of the
 2   three major credit bureaus. They will discuss your
 3   options with you. You have the right to ask that the
 4   three credit bureaus place a fraud alert in your file."
 5            Do you see that?
 6   A       Correct.
 7   Q       You didn't do that, though?
 8   A       Yes, I did.
 9   Q       You did place a fraud alert?
10   A       Yes. With TransUnion I placed a fraud alert,
11   correct, because I -- I chose TransUnion because I did not
12   like Experian and Equifax after the experience I've had
13   with them.
14   Q       When did you place that fraud alert on your file
15   with TransUnion?
16   A       I would say about -- a couple weeks ago to a
17   month.
18   Q       Why did you wait all that time to place a fraud
19   alert on your file when you got this letter in early
20   October 2007?
21   A       Because I -- I practically -- I did not pay
22   attention to that part. I was mostly -- my mindset was up
23   on the top part with the Triple Advantage Program at the
24   time, and so I reviewed it again and then I noticed -- I
25   noticed it again and it clicked.
```

Exhibit C
Page 8

40

JOEL RUIZ

BARKLEY
Court Reporters

```
 1   October 2007?
 2   A        Uh-huh, correct.
 3   Q        Did you keep a copy in your files at home of
 4   Exhibit 2?
 5   A        Yes.
 6   Q        Do you have a file at home that contains
 7   documents relating to this particular incident?
 8   A        Yes.
 9   Q        And what else is in there?
10   A        I have copies of the e-mails sent to me by
11   Experian regarding my -- the Triple Advantage Program.
12   Q        Okay.  You testified at the beginning of this
13   deposition that one of the things Gap did wrong was
14   failing to adequately protect the information that you had
15   included in your employment application.
16            Do you recall that testimony?
17   A        Correct.
18   Q        Given what you know about the incident, what do
19   you believe Gap should have done that would have better
20   protected your information?
21   A        Well, regarding the way the laptops were stolen,
22   they should have adequately -- oversight on the company
23   making sure they had the information encrypted and they
24   were not being put on laptops that could be carried out
25   into the public.
```

Exhibit C
Page 9

JOEL RUIZ

BARKLEY
Court Reporters

```
 1   A      Yes, I've always checked my Wells Fargo account.
 2   Q      Okay.  Your cell phone account is with T-Mobile?
 3   A      Correct.
 4   Q      Could you navigate to the T-Mobile site?
 5   A      Okay.  I went into the Web site,
 6   www.t-mobile.com.
 7   Q      Could you replicate for us the process that you
 8   undertook to pull up your phone records?
 9   A      I will not do that on this computer since I don't
10   know -- I don't know what you have behind it.
11   Q      You're concerned about the security of it?
12   A      Yes, of course.
13   Q      Okay.  Tell me all the things you can recall
14   doing to attempt to sign up for the Experian Triple
15   Advantage Program.
16   A      I visited the Web site listed on the letter here
17   on Exhibit 2, and after viewing the Web site, I read over
18   the information that it offers and then I attempted to
19   apply.  And after attempting to apply, I received an
20   e-mail stating that my information was not able to be
21   found or it was -- it was a vague -- vague e-mail on if I
22   had signed up or not.
23   Q      By the way -- we can go off the record for a
24   second.
25          (Off-the-record discussion.)
```

Exhibit C
Page 10

65

JOEL RUIZ

BARKLEY
Court Reporters

```
 1   Q        BY MR. STERN:  And as best you can recall, when
 2   did you attempt to sign up for the Experian Triple
 3   Advantage Program?
 4   A        I believe the date was December 10th, if I'm not
 5   mistaken.
 6   Q        Okay.  And you think that was done by an online
 7   application and not through the 866 toll-free number?
 8   A        Yes, it was online.
 9   Q        We're going to mark as Exhibit 5 Plaintiffs'
10   objections and responses to Defendant Gap, Inc.'s first
11   set of interrogatories.
12            (Whereupon Defendants' Exhibit 5 was
13            marked for identification.)
14            MS. REZVANI:  I have these, if you guys want
15   them.
16   Q        BY MR. STERN:  Mr. Ruiz, do you recognize
17   Exhibit 5?
18   A        Yes.
19   Q        Okay.  And if you turn to the second to the last
20   page, page 16, do you recognize your signature?
21   A        Yes.
22   Q        And did you sign Exhibit 5 on June 9th, 2008?
23   A        Yes.
24   Q        Take a look at Exhibit 1, which is the complaint,
25   and turn to page 17.  It's paragraph numbered 75.  Okay.
```

Exhibit C
Page 11

66

JOEL RUIZ

BARKLEY
Court Reporters

```
 1   Q        You didn't call Wells Fargo and get a new credit
 2   card issued, did you?
 3   A        No.
 4   Q        You didn't change your account number on any
 5   savings accounts with either Wells Fargo or any other
 6   banks, did you?
 7   A        No, because it would be pointless since that was
 8   not the information that was taken away from me.
 9   Q        And you never have, even to this day, asked for a
10   credit report from any of the three major credit reporting
11   companies; correct?
12   A        No, I have -- I have tried to get a credit
13   report, but again, I was unsuccessful with Experian.
14   Q        And what you did with TransUnion was put in a
15   credit freeze; correct?  That's different than a credit
16   report.
17   A        A fraud alert.
18   Q        I'm sorry.  Let me back up.
19            What you did with TransUnion was request a fraud
20   alert; correct?
21   A        Correct.
22   Q        But you didn't request a credit report from
23   TransUnion?
24   A        I believe I did request a credit report, but I
25   can't remember the details on that.
```

Exhibit C
Page 12

111

JOEL RUIZ

BARKLEY
Court Reporters

```
 1   Q        And that's something I think you said earlier you
 2   weren't able to access or something?
 3            MS. REZVANI:  Objection to the extent it confuses
 4   prior testimony.
 5            MR. STERN:  Yeah, I'll withdraw that.
 6   Q        Have you gone to the Social Security
 7   administration and asked them to issue a new Social
 8   Security number in your name?
 9   A        No.  I would not want to go through that process.
10   Q        How have you been harmed by the disclosure on the
11   laptop of your private information?
12   A        All the time I've spent on trying to get this
13   fixed, the -- with the confusion on Experian, Equifax,
14   these two companies, and I still don't believe I have
15   signed up for the Triple Advantage Program.  And just
16   the -- the attempt to come over here and try to make
17   everything right was a burden on myself also.
18   Q        Other than the time spent in trying to sign up
19   through Experian, your work as a class plaintiff in this
20   case, have you been harmed in any other way as a result of
21   the release on the laptop of your private information?
22            MS. REZVANI:  Objection to the extent it calls
23   for a legal conclusion.
24            THE WITNESS:  Do I have to answer it?
25            MS. REZVANI:  Yeah, you can answer.
```

112

Exhibit C
Page 13

JOEL RUIZ

BARKLEY
Court Reporters

```
 1              THE WITNESS:  I'm sorry.  I lost my train of
 2    thought.  Can you repeat?
 3    Q       BY MR. STERN:  Okay.  You testified about the
 4    time you spent.  And now my question is:  Other than time
 5    spent, in what other ways have you been harmed by the
 6    release of your private information on the laptop?
 7              MS. REZVANI:  Same objection.
 8              THE WITNESS:  The increased security threat of my
 9    information by Gap's third-party vendor has me -- has me
10    on the ball all the time now about my credit, about my
11    information, about my money, about my Social Security
12    number.  It could be used by anybody at any time.  If it's
13    sold -- if it's sold from now or 10 years from now, 20
14    years from now, it's going to be there in the back hiding,
15    waiting, and I can't do nothing about it.  That's the harm
16    that's been -- that I've been -- that I have.
17    Q       BY MR. STERN:  So the increased security threat,
18    the time you spent.
19            Is there anything else, any other ways in which
20    you've been harmed?
21              MS. REZVANI:  Same objection.
22              THE WITNESS:  No.
23    Q       BY MR. STERN:  If you were to leave your wallet
24    on this table and leave the deposition room for a few
25    minutes, and when you return, nothing has been taken out
```

113

Exhibit C
Page 14

JOEL RUIZ

BARKLEY
Court Reporters