WILLIAM L. STERN (CA SBN 96105)
TERESA N. BURLISON (CA SBN 230854)
GEOFFREY R. PITTMAN (CA SBN 253876)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522
E-mail:  wstern@mofo.com

Attorneys for Defendant
GAP INC.


ANDREW N. GOLDFARB (CA SBN 235615)
DOUGLAS R. MILLER
ZUCKERMAN SPAEDER LLP
1800 M St. NW Suite 1000
Washington DC 20036
Telephone: 202-778-1800
Facsimile: 202-822-8106
E-mail: agoldfarb@zuckerman.com

Attorneys for Defendant
VANGENT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JOEL RUIZ, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GAP INC., and VANGENT, INC.,<br><br>Defendants. | Case No.      C 07-5739 SC<br><br>**GAP INC. AND VANGENT, INC.'S MOTION TO STRIKE AND OBJECTIONS TO PLAINTIFF'S EXPERT REPORTS FILED IN SUPPORT OF HIS OPPOSITION TO SUMMARY JUDGMENT**<br><br>Date: March 20, 2009<br>Time: 10:00 a.m.<br>Room: Courtroom 1, 17th Floor<br>Judge: Honorable Samuel Conti<br><br>Complaint filed:      November 13, 2007 |

## I. INTRODUCTION

Pursuant to the Federal Rules of Evidence, Defendants Gap Inc. ("GAP") and Vangent, Inc. ("Vangent") (collectively "Defendants") submit the following objections to the expert opinions of James Van Dyke ("Van Dyke") and Dr. Larry Ponemon ("Ponemon") submitted by Plaintiff in support of his Opposition to Defendants' Motions for Summary Judgment (Docket #104). (Declaration of Rosemary M. Rivas in Opp. to Defs.' Motions for Summary Judgment ("Rivas Decl."), Exs. M and N.) As set forth in greater detail below, the Court should disregard the expert reports of both Van Dyke and Ponemon in their entirety because neither is admissible as a matter of law. They are unreliable, irrelevant, and provide no assistance to the Court in understanding the evidence or in determining any fact in issue in this case as required by Federal Rule of Evidence 702.

## II. ARGUMENT

### A. Plaintiff's Expert Reports Should Be Excluded in Their Entirety Because Even Under Plaintiff's Own Incorrect Standard, They Fail to Demonstrate That the Putative Class Has Suffered Compensable Injury.

Plaintiff proffers the testimony of Van Dyke and Ponemon for one reason: to support his erroneous contention that an increased risk of suffering identity theft – a *future* injury – constitutes a compensable legal injury. (*See* Plaintiff's MPA in Opp. to Defs.' Motions for Summary Judgment ("Opp."), 1:18-2:12, 6:11-7:3, 9:16-18; 11:1-12:9.) To support this contention, Plaintiff analogizes to medical monitoring cases, and cites *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965 (1993) for the proposition that even where a present injury is lacking, plaintiffs may recover the costs of future monitoring (i.e., credit monitoring in this case). (Opp., 10:13-28.) This analogy is inapt. (*See* GAP's Reply Brief to its Motion for Summary Judgment ("Reply Brief") [Docket #131] at 8:17-10:13.)

As explained in GAP's Reply Brief, *Potter* is inapplicable to this case because it does not involve identity theft or the misuse of personal information, it does not address the relevant issue here of whether potential future harm satisfies the injury element of a tort, and it has been expressly limited to (i) fear of cancer cases, (ii) arising from toxic torts, (iii) not in the context of negligence, but in the context of the tort of emotional distress. (*Id.* at 9:3-7.) However, even if

1  those obstacles were overcome and *Potter* was held to apply to this "fear of identity theft" case,
2  Plaintiff's expert reports fall well short of meeting *Potter*'s standard to demonstrate compensable
3  injury. Thus, they should be held inadmissible because they are irrelevant and will not assist the
4  Court in understanding the evidence or in determining any fact in issue. Fed. R. Evid. 702.

5  Under *Potter*, in order to recover damages for a claim of future injury, a plaintiff must
6  establish through "reliable medical or scientific opinion, that it is *more likely than not* that the
7  plaintiff will develop cancer in the future due to the toxic exposure." 6 Cal. 4th at 997 (emphasis
8  added). Plaintiff has not met or even purported to meet this standard. Plaintiff's expert reports,
9  even when most charitably viewed, fail to show that it is more likely than not that a member of
10 the putative class will suffer identity theft as a result of the laptop theft incident.

11 Van Dyke's report, at best, establishes only that people who receive notice of a data
12 breach are more likely to become victims of identity theft. (Rivas Decl., Ex. M, ¶ 4.) This
13 opinion is irrelevant because identity theft has not occurred here. There have been zero
14 confirmed instances of identity theft attributed to the stolen laptop. Even if Van Dyke's statistics
15 were born out in reality, they still fail to show that it is "more likely than not" that a member of
16 the putative class will suffer identity theft due to the laptop theft incident. Further, Ponemon's
17 report does not even attempt to quantify the increased risk of identity theft faced by the putative
18 class, and thus also fails to meet *Potter*'s standard for cognizable injury. (*See id.*, Ex. N.)
19 Therefore, even if Plaintiff's own erroneous standard is applied, his expert reports are
20 inadmissible because they are irrelevant and would not assist the Court in any way. Fed. R. Evid.
21 702. They should be stricken in their entirety.

22 **B. Even if the Court Finds that Plaintiff's Expert Reports Demonstrate a Sufficient Increased Likelihood of Harm, They Still Must be Excluded**
23 **Because They Do Not Constitute "Reliable . . . Scientific Opinion."**

24 Defendants further object to the admissibility of Plaintiff's expert reports because neither
25 report constitutes a "reliable . . . scientific opinion." *See Potter*, 6 Cal. 4th at 997; *see also* Fed.
26 R. Evid. 702. Both reports rely heavily on speculation, fail to consider or ignore substantial
27 evidence in this case, and fail to address the facts present here. Under Federal Rule of Evidence
28 702, these errors render Plaintiff's expert reports inadmissible.

1. **Van Dyke's Opinion Must be Excluded Because the Application of His Analysis to the Facts of this Case Renders his Statistical Analysis Meaningless and His Opinion Irrelevant.**

At the heart of Van Dyke's expert report is the statistical conclusion that, based on his company's 2008 Identity Fraud Survey, people who receive notification of a data breach will be four-times more likely to suffer identity theft within a 12-month period than people who are not notified of a data breach. (Rivas Decl., Ex. M, ¶ 4.) This statistic is then used by Van Dyke (and by Plaintiff) to conclude that members of the putative class have been placed at a "significantly higher risk" of becoming victims of identity theft due to the laptop theft incident. (*Id.*, ¶ 1.) An application of Van Dyke's analysis to the *actual* facts of this case, however, renders his statistical analysis wholly irrelevant and meaningless to the issues to be decided by the Court. Thus, his opinion should be disregarded under Federal Rule of Evidence 702.

Defendants object to Van Dyke's analysis because it does not address the facts of this case, and should therefore be excluded in its entirety. His opinion is based on an annual survey that involved a test population of 4,800 individuals. (Rivas Decl., Ex. M, ¶ 2.) As mentioned above, that survey determined that, within 12 months of being notified of a data breach incident, 19% of those surveyed reported that they were victims of identity fraud. (*Id.*, ¶ 4.) As to the general population, 4.32% reported that they became victims of identity fraud over the same time period. (*Id.*)

With all due respect to Mr. Van Dyke, irrespective of whether 19% of Americans who receive a notification letter suffer identity theft over the subsequent 12 months, we know that did not happen here. To date, there have been no confirmed instances of identity theft attributed to the stolen laptop. Therefore, Van Dyke's report is irrelevant to the issues faced by the Court, and provides no assistance to the Court as required by Federal Rule of Evidence 702. Thus, his opinion should be disregarded in its entirety.

2. **Van Dyke's Theory of Increased Risk of Identity Theft Should be Stricken for the Additional Reason that It Fails to Consider the Actual Facts of this Case.**

Defendants further object to the admissibility of Van Dyke's expert report because his hypothesis does not fit the facts of this case. Federal Rule of Evidence 702 provides, in relevant

1  part, that in order for expert testimony to be admissible, it must apply the "principles and methods
2  [of the expert's hypothesis] reliably to facts of the case." Van Dyke's expert report fails to do
3  this. His theory describes a person's "Day One" risk, that is, the risk of someone receiving a data
4  breach notification letter today and having an identity theft in the next 12 months. (Rivas Decl.,
5  Ex. M, ¶ 4.) As set forth above, Van Dyke's report quantifies this risk as four-times greater for
6  people notified of a data breach than those who are not. (*Id.*)[1] But those are not the facts of this
7  case.

8  This case does not present a "Day One" risk. The laptop was stolen from Vangent's office
9  in Chicago in September 2007. By the time the Court hears the parties' pending motions, it will
10 have been 18 months since the laptop theft incident without a single instance of identity theft
11 attributed to the stolen laptop. Had Van Dyke reliably applied his principles and methods to the
12 actual facts of this case, he should have addressed the question: "What are someone's chances of
13 a data theft from a stolen laptop if, as here, there were no incidents of identity theft during the
14 first 18 months following the theft?" Because Van Dyke's opinion did not apply his hypothesis
15 to the actual facts of this case, his conclusion that putative class members are faced with a
16 "significantly higher risk" of suffering identity theft due to the laptop theft incident should be
17 excluded.

18  Indeed, Van Dyke's own report states that only 10% of all identity theft victims had their
19 data used after 12 months of being notified of a data breach incident. (Rivas Decl., Ex. M, ¶ 12.)
20 In other words, there is a *dramatic drop in risk* after the first 12 months. Here, with this breach
21 having occurred 18 months ago, the drop in risk must be even greater. Thus, the risk that Van
22 Dyke describes as "substantial" is no such thing at all. Therefore, the Court should exclude Van
23 Dyke's report in its entirety under Federal Rule of Evidence 702.

---

[1] Van Dyke's 19% figure appears to be tremendously inflated. It appears to include all notification events, including hacking events (*e.g.* TJ Maxx) in which the thief had the specific intent to steal personal identifying information, as opposed to a property crime, as in this case, that happened to include incidental personal identifying information. He does not adjust for that discrepancy.

### 3. Van Dyke's Report Must be Excluded Because It Provides No Basis for the Court to Conclude That Van Dyke's Opinion is Based on Sufficient Facts or Data or Is the Product of Reliable Principles and Methods.

Even if the report reliably applied Van Dyke's principles and methods to the facts of the case (which it does not), it would still be inadmissible because nothing in the report provides a basis for the Court to conclude that Van Dyke's opinion "is based upon sufficient facts or data" or "is the product of reliable principles and methods," as is required under Federal Rule of Evidence 702.

Van Dyke's analysis is purportedly based on his company's annual Identity Fraud Survey, (Rivas Decl., Ex. M, ¶ 2), about which his report provides almost no information. Van Dyke does not state whether the survey or its methodology has been subject to peer-review. He reports that the survey was administered to "4,784 U.S. adults over age 18 and a sample that is representative of the U.S. demographic distribution, based on age, gender, income and ethnicity," (*id.* ¶ 4), but does not explain what steps were taken to achieve a representative sampling in each category. Nor does he address how, if at all, the voluntary telephone survey identified or corrected for self-selection bias (for example, if there were a disproportionately high response rate among identity fraud victims because they had more personal interest in the survey topic than other potential respondents).

He claims that the survey was "of comparable design methodology to the 2003 Federal Trade Commission Identity Theft Survey Report," (*id.* ¶ 2), but does not describe the FTC Survey's methodology. He states that "487 victims were interviewed via a standardized 50-question telephone survey" (*id.* ¶ 3), but does not explain the criteria by which an initial respondent was assigned to the "victim" set. Nor does he provide the text of these 50 questions, or describe them in any fashion other than to say that they were "identical to or highly similar to the 2007, 2006, 2005, 2004 and 2003 surveys." (*Id.* ¶ 3.) He does not provide any questions from these prior surveys.

Van Dyke reports that "of Americans notified of a data breach in the last 12 months, 19% reported becoming victims of identity fraud in the last 12 months [i]n contrast [to] only 4.32% of

all Americans." (*Id.* ¶ 4.) But he does not explain how, if at all, the survey identified or corrected for confirmation bias—i.e., considered whether individuals who had received prior notification of a data breach were more likely to label an ambiguous event as identity fraud.

Van Dyke claims that "[t]he facts of the GAP data breach" put Plaintiff and the Class at particular risk for "new account identity theft," as compared to other forms of identity fraud. (*Id.* ¶¶ 2, 5.) But he nowhere indicates what questions respondents were asked about the manner in which their data was breached, or how such responses were correlated with the form of identity fraud that the respondent later suffered.

Van Dyke reports no qualifications or experience in criminology, police work, or burglary investigation, yet he opines that "the laptop . . . appears to have been selectively stolen from a particular location on a particular floor of defendant Vangent's office building after repeated attempts to enter the facility." (*Id.* ¶ 5.)

And Van Dyke is inconsistent in providing confidence intervals for the many percentages he reports. (*Compare id.* ¶¶ 4, 11 (confidence intervals reported) *with id.* ¶¶ 6, 12 (no confidence intervals reported.))

In short, nothing in Van Dyke's report permits the Court to admit his opinion while exercising the Court's "gate-keeping function," which requires more than simply taking the expert's word for it. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir.1995). Van Dyke's description of his survey is too imprecise for the Court to determine whether his opinion is "connected to existing data" by any more than "the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### C. Specific Portions of Both of Plaintiff's Experts' Reports Should Also Be Excluded Under the Federal Rules of Evidence.

Additionally, if the Court is inclined not to exclude Plaintiff's expert reports in their entirety based on the objections set forth above, Defendants submit the following more specific objections to the contents of the two reports.[2]

---

[2] Attached hereto as Appendix A is a complete list of all of Defendants' specific objections to Plaintiff's expert reports.

1         First, Defendants object to both experts' opinions that putative class members are subject to an increased risk of identity theft because the facts of this case indicate that the laptop theft incident was a data theft crime rather than a property theft crime. (Rivas Decl., Ex. M, ¶ 5; Ex. N, ¶¶ 2, 9.) Van Dyke's statement that "[t]he facts of the GAP data breach make identity fraud more likely" is inadmissible because it lacks foundation, is based on speculation, and is ultimately irrelevant to the issues before the Court. Nowhere in Van Dyke's report is a foundation properly laid for this opinion: he is not a criminologist, and therefore, his opinion about the type of crime that occurred at Vangent's facility in September 2007 amounts to inadmissible speculation. Ponemon's conclusion that the laptop theft was a data theft crime is objectionable on identical grounds. Further, both opinions demonstrate that Plaintiff's experts selectively chose what data to review regarding the facts of the laptop theft. In concluding that this was a data theft crime, both Van Dyke and Ponemon conveniently ignored (or were not shown) the contrary conclusions of the FBI, the Chicago Police Department, Dr. Aviel Rubin, and GAP, through its motion for summary judgment (Docket #100), that this was a property theft crime. (*Id.*, Ex. M, ¶ 2; Ex. N, ¶ 1.) Thus, these opinions should be excluded.

         Second, Defendants object to Ponemon's opinion that a thief would recognize that there was sensitive personal information contained on the stolen laptop even if the laptops were not targeted for their data. (Rivas Decl., Ex. N, ¶ 5.) Just like his opinion that this was a data theft crime, Ponemon's opinion is inadmissible because it lacks foundation, is based on speculation, and is ultimately irrelevant to the issues before the Court. Therefore, the conclusion that "it is likely that the Gap employment applicant data contained on the stolen laptop will still be used for nefarious purposes" is based on nothing more than Mr. Ponemon's speculation. (*Id.*) It should therefore be excluded.

         Lastly, Defendants object to Van Dyke's conclusions that putative class members should be provided with extensive mitigation solutions to prevent and detect identity fraud and misuse, and that more than one year of credit monitoring is needed for breaches like the one in this case. (*Id.*, Ex. M, ¶¶ 6, 12.) Both of these opinions go to the ultimate legal issue in this case, and are

therefore improper subjects for expert testimony. *See, e.g., McHugh v. United Service Auto Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999). Thus, these opinions should be excluded.

### III. CONCLUSION

Defendants respectfully request that the Court strike all, or at least part, of the expert reports submitted by Plaintiff based on the evidentiary objections set forth above.

Dated: March 6, 2009

WILLIAM L. STERN (CA SBN 96105)
TERESA N. BURLISON (CA SBN 230854)
GEOFFREY R. PITTMAN (CA SBN 253876)
**MORRISON & FOERSTER LLP**

By: /s/William L. Stern
William L. Stern

Attorneys for Defendant GAP INC.

ANDREW N. GOLDFARB (CA SBN 235615)
DOUGLAS R. MILLER
**ZUCKERMAN SPAEDER LLP**

By: /s/Andrew N. Goldfarb
Andrew N. Goldfarb

Attorneys for Defendant Vangent, Inc.

I, William L. Stern, am the ECF User whose ID and password are being used to file this Gap Inc. And Vangent, Inc.'s Motion To Strike And Objections To Plaintiff's Expert Reports Filed In Support Of His Opposition To Summary Judgment. In compliance with General Order 45, X.B., I hereby attest that Andrew N. Goldfarb has consented to its filing in this action.

Dated: March 6, 2009.

MORRISON & FOERSTER LLP

_____/s/ William L. Stern_____
William L. Stern

# APPENDIX A

| Report Paragraph | Objection(s) |
|---|---|
| Ponemon Decl., ¶ 1 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702<br>• Lack of foundation |
| Ponemon Decl., ¶ 2 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702<br>• Relevance. FRE 401, 402, 403 |
| Ponemon Decl., ¶ 3 | • Hearsay. FRE 801.<br>• Inadmissible expert opinion. FRE 702 |
| Ponemon Decl., ¶ 4 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702 |
| Ponemon Decl., ¶ 5 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702<br>• Lack of foundation |
| Ponemon Decl., ¶ 6 | • Hearsay. FRE 801. |
| Ponemon Decl., ¶ 7 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702 |
| Ponemon Decl., ¶ 8 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702 |
| Ponemon Decl., ¶ 9 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702<br>• Relevance. FRE 401, 402, 403 |
| Van Dyke Decl., ¶ 1 | • Hearsay. FRE 801. |
| Van Dyke Decl., ¶ 2 | • Inadmissible expert opinion. FRE 702 |
| Van Dyke Decl., ¶ 3 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702 |
| Van Dyke Decl., ¶ 4 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702<br>• Relevance. FRE 401, 402, 403 |
| Van Dyke Decl., ¶ 5 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702<br>• Relevance. FRE 401, 402, 403.<br>• Lack of foundation. |
| Van Dyke Decl., ¶ 6 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702<br>• Relevance. FRE 401, 402, 403<br>• Improper legal opinion |
| Van Dyke Decl., ¶ 7 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702 |
| Van Dyke Decl., ¶ 8 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702 |
| Van Dyke Decl., ¶ 9 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702 |
| Van Dyke Decl., ¶ 10 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702 |
| Van Dyke Decl., ¶ 11 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702 |
| Van Dyke Decl., ¶ 12 | • Hearsay. FRE 801<br>• Inadmissible expert opinion. FRE 702<br>• Improper legal opinion |